IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

NANCY L. NEWMAN,                        )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )          CIVIL ACTION NO. 5:06-00955
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.

By Standing Order entered November 9, 2006 (Doc. No. 4.), this case was referred to the undersigned

United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed

Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings.

(Doc. Nos. 21 and 26.)

The Plaintiff, Nancy L. Newman, (hereinafter referred to as "Claimant"), filed applications

for SSI and DIB on March 9, 2000 (protective filing date), alleging disability as of January 25, 2000,

due to severe and chronic pain in her neck and back that causes radicular problems down into her

arms and hands. (Tr. at 169-71, 194, 1035-37.) The claims were denied initially, (Tr. at 137-38.), and

her second application, filed on December 27, 2000, was merged with the first claim upon

reconsideration where both claims were denied. (Tr. at 142-45, 1039-41, 1045-48.) Pursuant to

Claimant's request, a hearing was held on September 26, 2001, before the Honorable David S.

Antrobus, Administrative Law Judge ("ALJ"). (Tr. at 64-87.) By decision dated September 27, 2002, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 123-32.) On November 5, 2002, Claimant filed a third application for benefits. (Tr. at 184-86, 1062-65.) The third claim was denied initially and on reconsideration. (Tr. at 1066-72, 1074-77.)

On December 19, 2003, the Appeals Council granted Claimant's request for review, vacated the ALJ's decision of September 27, 2002, and remanded all three claims back to the ALJ. (Tr. at 133-35.) On October 8, 2002, Claimant requested a hearing before an ALJ. (Tr. at 155.) The hearing was held on February 9, 2005, before the Honorable Theodore Burock. (Tr. at 88-116.) By decision dated July 12, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 2353) The ALJ's decision became the final decision of the Commissioner on September 15, 2006, when the Appeals Council denied Claimant's request for review. (Tr. at 13-16.) Claimant filed the present action seeking judicial review of the administrative decision on November 9, 2006, pursuant to 42 U.S.C. § 405(g). (Doc. No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2004). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a).[1] First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

*(c) Rating the degree of functional limitation.* (1)Assessment of functional

---

[1] As noted above, these Regulations were substantially revised effective September 20, 2000. *See* 65 Federal Register 50746, 50774 (August 21, 2000).

limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a

4

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 25.) Under the second inquiry, the ALJ found that Claimant suffered from diabetes mellitus, osteoporosis, cervical spine syndrome, lumbar spine syndrome, carpal tunnel syndrome, right shoulder syndrome, left knee syndrome, fibromyalgia, a visual impairment, and a combination of mental disorders including a

---

chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

depressive disorder, an anxiety related disorder, a personality disorder, and a somatoform disorder, which were severe impairments. (Id.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Id.) The ALJ then found that Claimant had a residual functional capacity to perform light exertional level work, noting the following limitations:

> She is nonexertionally limited to routine repetitive tasks. She can occasionally climb, balance, stoop, kneel, crouch, or crawl. She cannot make more than frequent use of the upper extremities, frequent being defined as up to two-thirds of the time. She cannot tolerate moderate exposure to vibration or any exposure to extreme cold or hazards.

(Id.) The ALJ concluded, in view of Claimant's residual functional capacity and based upon the testimony of Vocational Expert ("VE"), Olen J. Dodd, that Claimant could return to her past relevant work activities of a telemarketer, as Claimant actually performed the job, and of a cashier, as ordinarily required by employers in the national economy. (Tr. at 53-53.) On this basis, benefits were denied. (Id.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on December 29, 1954, and was 50 years old at the time of the second administrative hearing. (Tr. at 93, 169.) Claimant had twelfth grade and a Generalized Equivalency Diploma. (Tr. at 95, 201.) In the past, she worked as a telemarketer and cashier. (Tr. at 50-51, 109-10, 196.)

<u>The Medical Record</u>

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) determining Claimant's severe impairments regarding the period of time following her date last insured, (2) considering whether Claimant met the requirements of Listings 12.07 and 12.08 for DIB and SSI, (3) assessing Claimant's residual functional capacity ("RFC"), and (4) concluding that Claimant retained the RFC to perform her past relevant work ("PRW"), and not proceeding to considering Claimant's entitlement to benefits pursuant to step five of the sequential analysis. (Doc. No. 21 at 8-37.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Doc. No. 26 at 13-18.)

**1. <u>Severe Impairments</u>.**

Claimant alleges that the ALJ erred in determining her severe impairments at step two of the sequential analysis. (Doc. No. 21 at 9-19.) Specifically, she first alleges that the ALJ separately

discussed Claimant's applications for DIB and SSI, and therefore, "[i]t is unclear whether the ALJ meant this assessment of 'severe impairments' to relate to both the claimant's Disability and SSI applications or only to the Disability Applications." (Id. at 11.) The Commissioner asserts that Claimant's argument is without merit because under the Regulations, severe impairments are defined identically for DIB and SSI applications. (Doc. No. 26 at 13.) The Commissioner further asserts that the ALJ separated his discussion of Claimant's impairments "only as a means of separating the voluminous medical record which totals 1145 pages and includes 79 medical exhibits." (Id.)

The undersigned agrees with the Commissioner. A severe impairment is defined under 20 C.F.R. §§ 404.1520(c) **and** 416.920(c), as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006); see also, 20 C.F.R. §§ 404.1505, 404.1521; 416.905, 416.921 (2006). At page three of his decision, the ALJ determined that Claimant suffered from the following severe impairments:

> diabetes mellitus, osteoporosis, cervical spine syndrome, lumbar spine syndrome, carpal tunnel syndrome, right shoulder syndrome, left knee syndrome, fibromyalgia, a visual impairment, and a combination of mental disorders including a depressive disorder, an anxiety-related disorder, a personality disorder, and a somatoform disorder.

(Tr. at 25.) The ALJ then proceeded to discuss Claimant's physical and mental impairments at steps two and three of the sequential analysis regarding the impairments prior to Claimant's date last insured on pages four through seventeen of his decision, and regarding Claimant's impairments subsequent to her date last insured on pages seventeen through twenty-two. (Tr. at 29-44.) Of significance, the undersigned notes that though the ALJ found Claimant's visual impairment to be a severe impairment at page three of his decision, he did not conclude that such impairment was severe prior to the date last insured. (Tr. at 25, 30.) In discussing Claimant's impairments prior to her date last insured, the ALJ stated: "The medical evidence does not corroborate visual disturbances

8

prior to the date last insured." (Tr. at 30.) The ALJ noted that while Claimant experienced a temporary visual loss in October, 1998, she did not experience a similar loss in vision since then. (Tr. at 30.) Additionally, the ALJ noted that the records prior to her date last insured did not reflect any complaints of eye problems. (Id.) However, in discussing Claimant's impairments subsequent to her date last insured, the ALJ concluded that Claimant's glaucoma, senile cataracts, and keratitis sicca resulted in a severe visual impairment. (Tr. at 40-41.) The ALJ noted that Claimant was diagnosed with senile cataracts in November, 2003, and that her keratitis sicca and glaucoma conditions were described as uncontrolled at that time. (Tr. at 40.) The ALJ therefore, determined that "[t]he lack of aggressiveness with which the claimant pursued follow-up argues against the severity of any visual symptoms before November 2003 as well as the claimant's concern over glaucoma." (Tr. at 41.)

It is clear from the foregoing that the ALJ's listing of severe impairments at page three of his decision was inclusive of both her applications for DIB and SSI. As the Commissioner suggests, the ALJ bifurcated his discussion as to Claimant's DIB and SSI applications as a means of sifting through the voluminous record. Accordingly, the undersigned finds that Claimant's argument on this issue is without merit.

Claimant next alleges that the ALJ omitted several "additional impairments" identified in his discussion of Claimant's impairments subsequent to her date last insured from his severe impairment findings at page three of his decision. (Doc. No. 21 at 11-12.) The Commissioner asserts that "the ALJ did not omit any of these "additional impairments" from his consideration at step two of the sequential evaluation process." (Doc. No. 26 at 14.) Rather, the Commissioner contends that the ALJ's discussion of these additional impairments "specifies that each is subsumed within another impairment which the ALJ previously found severe." (Id. at 13.)

In discussing the evidence subsequent to Claimant's date last insured, regarding her application for SSI, the ALJ stated:

> In addition to the other physical conditions present prior to the date last insured, the claimant has been diagnosed with suprascapular neuritis, secondary to degenerative disc disease of the cervical spine, which contributes to the claimant's cervical spine syndrome; glenohumeral joint arthropathy, which constitutes a severe shoulder impairment; and glaucoma, senile cataracts, and keratitis sicca, which result in a visual impairment. The claimant was very recently, in December 2004, diagnosed with tendonopathy and peritendinitis of the right rotator cuff, a condition that has recently exacerbated her shoulder symptoms on the right. In addition to the previously diagnosed mental disorders, the current medical evidence establishes a depressive syndrome.

(Tr. at 39-40.) Expanding on the discussion above, the undersigned agrees with the Commissioner and finds that each of these "additional impairments" are subsumed within the severe impairments identified on page three of the ALJ's decision. These "additional impairments" were identified separately on pages seventeen and eighteen of the decision because they were, for the reasons identified by the ALJ, not determined to be severe until after her date last insured. The ALJ stated that Claimant's suprascapular neuritis contributed to Claimant's cervical spine syndrome, which he stated was a severe impairment. Likewise, Claimant's glenohumeral joint arthropathy was a severe shoulder impairment, as already identified on page three. As discussed above, Claimant's eye conditions were not determined to be severe impairments until after Claimant's date last insured, and therefore, her glaucoma, senile cataracts, and keratitis sicca, were subsumed in the visual impairment, as stated on page three of the ALJ's decision. The same applies to Claimant's tendonopathy and peritendinitis, which exacerbated her shoulder impairment, as stated on page three, and the depressive syndrome, was clearly subsumed in the already stated depressive disorder, which was within the general category of mental disorders. Accordingly, the undersigned finds that each of the "additional impairments" specifically stated on pages seventeen and eighteen of the ALJ's decision were subsumed within the more general impairment stated on page three of the decision, and therefore, were included as severe impairments.

Third, Claimant alleges that the ALJ erred in not determining that the following impairments

10

were severe at step two of the sequential analysis:

> cervical, thoracic and lumbar facet joint arthropathy, additional right shoulder symptoms and limitation, an upper right extremity impairment, degenerative disc and joint disease of the entire spine, anteriolesthesis of the cervical region, foraminal encroachment of the cervical spine, cervicogenic headaches, myofascial pain affecting her neck, shoulder, arm, back, knees, feet and ankles, suprascapular neuritis, glenohumeral joint arhtropathy, sacroiliac joint dysfunction, generalized osteoarthritis, increased knee impairments, cyclic/long term Neutropenia, glaucoma and other visual impairments, and depressive, anxiety, personality, and somatization disorders all of which merit consideration under steps 2 through 5 of the sequential evaluation process, which unfortunately was not done by the Administrative Law Judge.

(Doc. No. 21 at 12.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe. 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006); see also 20 C.F.R. §§ 404.1521(a); 416.921(a) (2006); Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987) (recognizing change in severity standard). As stated above, a severe impairment is one "which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006); see also, 20 C.F.R. §§ 404.1521(a); 416.921(a) (2006). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b); 416.921(b) (2006). Examples of basic work activities under those sections are:

> (1)  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2)  Capacities for seeing, hearing, and speaking;
> (3)  Understanding, carrying out, and remembering simple instructions;
> (4)  Use of judgment;
> (5)  Responding appropriately to supervision, co-workers and usual work situations;  and
> (6)  Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b); 416.921(b) (2006). Claimants are responsible for providing medical evidence demonstrating that they have severe impairment(s) during the time they claim they are

disabled. See 20 C.F.R. §§ 404.1512(c); 416.912(c).

With the exception of Claimant's myofascial syndrome, the undersigned finds, as the Commissioner asserts, that the several impairments listed by Claimant either were considered specifically by the ALJ in his decision, were symptoms of the impairments addressed by the ALJ, or were not determined to be severe impairments. Specifically, the ALJ considered Claimant's cyclic neutropenia and concluded that it was not a severe impairment. (Tr. at 26.) As already discussed, the suprascapular neuritis, glenohumeral joint arthropathy, and glaucoma were subsumed in Claimant's severe cervical syndrome, shoulder impairment, and visual impairment. (Tr. at 25.) Claimant's depressive, anxiety, personality, and somatization disorders were considered by the ALJ in his assessment of Claimant's severe mental impairments. (Tr. at 25, 15-17.) The undersigned finds that the remaining listed impairments are actually symptoms of those impairments determined to be severe. (Tr. at 25.) Accordingly, the undersigned finds Claimant's argument on this issue to be without merit.

Regarding Claimant's myofascial pain disorder, the Commissioner asserts that the ALJ inadvertently excluded the disorder from his formal list of severe impairments. The undersigned agrees. It is clear that the ALJ noted Claimant's myofascial pain disorder at steps two and three of the sequential analysis. (Tr. at 28, 41.) Regarding Claimant's application for DIB, at step two the ALJ noted Dr. Ramesh's diagnosis of myofascial pain syndrome involving the trapezius muscles bilaterally, which exhibited multiple trigger points. (Tr. at 28.) At step three of the sequential analysis, the ALJ then proceeded to consider the impairment under the Listings, but noted that the condition was not addressed by a specific Listing. (Id.) Had the ALJ not considered Claimant's myofascial pain syndrome a severe impairment, then he would not have attempted to consider the condition individually under the Listings. The same can be said for the condition regarding

12

Claimant's application for SSI. (Tr. at 41.) The ALJ further considered Claimant's myofascial pain disorder in assessing Claimant's RFC. Accordingly, the undersigned finds that the ALJ's error in not identifying specifically Claimant's myofascial pain disorder as a severe impairment is harmless error.

Fourth, Claimant argues that the ALJ failed to discuss the effects of Claimant's fibromyalgia, myofascial disorder, or osteoarthritis on her right arm, hands, neck, back hip, ankles, and feet. (Doc. No. 21 at 13, 15-16.) The Commissioner asserts that Claimant "does not address what specific work-related functional limitations effecting her right arm, hands, neck, back, hip, and ankles, and feet, result from her fibromyalgia which the ALJ excluded from his residual functional capacity assessment." (Doc. No. 26 at 14-15.) Again, the undersigned must agree with the Commissioner. It is clear from the ALJ's decision that he addressed Claimant's fibromyalgia, myofascial disorder, and osteoarthritis in his decision. (Tr. at 26-34.) He further assessed the limitations supported by the record. To the extent that additional functional limitations exist that were not considered by the ALJ, Claimant does not identify them.

Finally, Claimant argues that her cyclic neutropenia was a severe impairment because "her treating physicians were unable to treat her with non-steroidal anti-inflammatory medications (NSAIDS)." (Doc. No. 21 at 14.) Claimant asserts that her treating physicians therefore, had to treat her with multiple medications. (Id. at 14-15.) The Commissioner asserts that the ALJ concluded that Claimant's cyclic neutropenia was benign and required no treatment. (Doc. No. 26 at 15.) Though the condition required her physicians to use medications other than NSAIDS in treating her other conditions, the Commissioner asserts that those impairments were not otherwise disabling using the medication that was available to Claimant. (Id.)

In his decision, the ALJ noted that Claimant suffered from cyclic neutropenia, "or regular fluctuation in her neutrophil count, of unspecified etiology." (Tr. at 26.) He noted that Claimant was

diagnosed with the condition in 1997, but that a bone marrow biopsy revealed that the condition was benign and did not require follow-up treatment. (Id.) The ALJ proceeded to consider the impairment under similar Listings and determined that it did not meet Listing 7.15. (Id.) Though the condition contraindicates the use of NSAIDS, typically used to treat musculoskeletal pains, the undersigned finds that the Claimant was prescribed other medications to treat her musculoskeletal-related conditions. She has neither alleged that another condition was disabling due to the use of a medication other than a NSAID or that the other medication was unable to treat the condition but that a NSAID could. Accordingly, the undersigned finds that the ALJ's decision that Claimant's cyclic neutropenia is not a severe impairment is supported by substantial evidence of record.

**2. Listings 12.07 and 12.08.**

Claimant next alleges that the ALJ failed to assess properly the "B" criteria of Claimant's mental impairments under Listings 12.07 Somatoform Disorders and 12.08 Personality Disorders. (Doc. No. 21 at 19-27.) Specifically, she asserts that the ALJ "made no finding regarding the final 'B' criteria of such Listings." (Id. at 20.) Claimant argues that her testimony given at the February 9, 2005, administrative hearing and her written reports of April, 2003, and March 1, 2000, together with the psychological evaluations of Sheila Kelly, M.A., a licensed psychologist, on August 17, 2001, and Dr. M. Khalid Hasan, dated January 13, 2005, demonstrate that she meets the "B" criteria. (Id. at 23-27.) The Commissioner asserts that though the ALJ did not make a specific finding regarding the functional limitation of Claimant's episodes of decompensation, Claimant "did not exhibit at least one other marked area of functional limitation," and therefore, could not meet the criteria of Listings 12.07 and 12.08. (Doc. No. 26 at 15-16.) The Commissioner further asserts that the ALJ properly found that Claimant was not entirely credible, that Dr. Kelly's report was rejected because it was not supported adequately by clinical findings and was inconsistent with the record,

14

and that Dr. Hasan's report was given no weight due to internal inconsistencies. (Id. at 16.)

"The Listing of Impairments . . . describes, for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. §§ 404.1525(a), 416.925(a) (2006); see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 891, 107 L.Ed.2d 967 (1990). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." See id. at 531 (emphasis in original).

Section 12.07 of the Listing of Impairments, covers Somatoform Disorders, and provides as follows:

> *Somatoform Disorders.* Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> * * *
> B.  Resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning: or
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.07 (2006). Section 12.08 of the Listing of Impairments, covers Personality Disorders, and similarly provides as follows:

> *Personality Disorders.* A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness.
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
> * * *

15

        B.  Resulting in at least two of the following:
        1. Marked restriction of activities of daily living; or
        2. Marked difficulties in maintaining social functioning: or
        3. Marked difficulties in maintaining concentration, persistence or pace; or
        4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.08 (2006).

      In the instant case, the ALJ found and the parties agree that the ALJ evaluated Claimant's somatoform and personality disorders under 12.07 and 12.08 and determined that Claimant met the clinical "A" criteria but not the functional requirements of the "B" criteria, and therefore, failed to meet the Listings. (Tr. at 39.) The Court therefore, needs only to address the ALJ's finding with regard to the "B" criteria. As Claimant notes, the ALJ did not make a specific finding as to the "B" criteria. Rather, after concluding that Claimant met the "A" criteria, he proceeded to consider Claimant's ability to maintain activities of daily living, social functioning, and concentration, persistence, and pace. In this regard, at step three of the special technique, the ALJ determined the degree of functional limitation from Claimant's mental impairments as follows: The undersigned concludes that the claimant was mildly limited in carrying on activities of daily living, mildly limited in social functioning, and moderately limited in maintaining concentration, persistence, or pace." (Tr. at 39, 49.) The Court will consider the relevant areas in turn.

      A. _Activities of Daily Living_.

      The ALJ determined that Claimant had only mild limitations in activities of daily living. Activities of daily living include adaptive activities like cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for one's grooming and hygiene, using phones and directories, and using a post office. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (2006). The quality of these activities are assessed by their independence, appropriateness, effectiveness, and sustainability. Id. "Marked" limitation in this area is defined by

"the nature and overall degree of interference with function." Id. It is necessary to determine the extent to which the individual is capable of initiating and participating in activities independent of supervision or direction. Id.

The ALJ noted that Claimant lives alone and requires some help with personal grooming, but was able to care for her hygiene and grooming without evidence of deterioration, and appeared neat and tidy. (Tr. at 39, 49, 209, 230, 535, 589, 1012.) He noted that she maintained her own home, prepared simple meals, drove to the post office independently several times a week and to the grocery store once a week, and drove to her medical appointments. (Tr. at 39, 95, 100, 210, 212, 230-32, 1013.) He noted that though Claimant had to make frequent trips to the grocery store and carry few groceries at a time, she did her own shopping. (Tr. at 39, 210.) She does rely on her niece and daughters to assist with heavier household chores . (Tr. at 39, 210, 231.) Claimant also reported that she watched television. (Tr. at 100, 211.) On April 18, 2001, and August 15, 2001, she reported to Dr. Shishir Shah, M.D., and Dr. Cecil C. Graham, M.D., respectively, that she walked some for exercise. (Tr. at 532, 535, 606.) On August 17, 2001, she reported to Ms. Sheila E. Kelly, M.A., a licensed psychologist, that she drives, visits her daughter who lives three to four miles from her, does light dusting and laundry, and watches a lot of television. (Tr. at 588-89.) Accordingly, based upon the foregoing, the ALJ's determination of only mild limitations in this area is supported by substantial evidence.

B. *Social Functioning.*

The ALJ determined that the combination of Claimant's mental impairments caused only mild limitations in the ability to maintain social functioning. (Tr. at 39, 49.) Social functioning refers to one's capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) (2006). It includes the ability

to get along with family members, friends, neighbors, grocery clerks, landlords, or bus drivers. Id.

The ALJ noted that Claimant was married and lived with her husband when she stopped working. (Tr. at 39.) She was divorced in July, 2001, and has had a boyfriend since then. (Tr. at 49.) The ALJ noted that Claimant's mother and daughter are very supportive. (Tr. at 49.) She blames her difficulty in maintaining her marriage and friendships in general on her medical problems. (Tr. at 49.) Claimant testified that she gets along fairly well with others but that she is not around other people that often. (Tr. at 49, 101.) She further testified that she gave up the hobbies of gardening, crocheting, hunting, and riding horses due to her physical conditions, and does not attend church or participate in any social activities. (Tr. at 100-01.) However, as stated above, she drives to the post office at least three times a week and continues to shop for groceries.  On psychological evaluation on August 17, 2001, Ms. Kelly opined that Claimant was so wrapped up in her various somatic complaints that she has little time for anyone else. (Tr. at 591.) Ms. Kelly further opined that "it's amazing that she has been able to be married four times although those marriages were all unsuccessful, chiefly because of her ongoing and chronic medical complaints and disorders. She now lives alone in a mobile home, seeing only her daughter." (Id.) In a form Disability Report dated March 1, 2000, Claimant reported that due to her severe pain, she experienced mood swings and is nervous around others. (Tr. at 202.) Upon evaluation with Dr. Hasan, Claimant was cooperative, talked clearly and rationally, and apparently had no difficulty with or relating to him. (Tr. at 1012.) Based on the foregoing, the undersigned finds that the ALJ's determination that Claimant is mildly limited in her ability to maintain social functioning is supported by substantial evidence.

C. *Concentration, Persistence, or Pace.*

The ALJ determined that Claimant had experienced moderate limitations in concentration, persistence or pace due to her combined mental impairments. (Tr. at 39, 49.) Concentration,

persistence or pace "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3) (2006).

The ALJ noted that Claimant was able to follow a movie or television program, pay bills and manage her finances, and do her own grocery shopping. (Tr. at 39, 100.) However, Claimant reported that she experienced significant difficulties in concentrating and persisting on a task because she was focused on her pain. (Tr. at 49, 216, 234.) She testified that she experiences crying spells on average of two to three times a week, that she cannot concentrate, and that she frequently forgets what she is saying or doing. (Tr. at 104.) On mental status exam, Ms. Kelly did not assess Claimant's memory or judgment. Nevertheless, Dr. Hasan opined that she had fair insight, judgment, and problem solving abilities. (Tr. at 1012.) Moreover, as mentioned above, Claimant is able to perform household chores, drive, watch television, manage her own finances, and live alone, without a considerable degree of assistance. Accordingly, the undersigned finds that the ALJ's determination that Claimant is moderately limited in her ability to maintain concentration, persistence, or pace is supported by substantial evidence.

The ALJ did not make a specific finding as to whether Claimant experienced any episodes of decompensation due to her somatoform and personality disorders. However, the undersigned need not address this element, as it cannot be shown that Claimant's somatoform or personality disorders met at least two of the four elements of the "B" criteria. The Court has already determined that the ALJ properly found that Claimant's somatoform and personality disorders did not rise to the necessary level on three out of four elements of the "B" criteria and the undersigned need not address episodes of decompensation. The ALJ's determination that Claimant's somatoform and personality disorders did not meet Listings 12.07 and 12.08 is supported by substantial evidence.

19

**3. <u>RFC Assessment</u>**.

Claimant also alleges that the ALJ's RFC assessment

was not based upon any objective medical evidence of record, or in accordance with applicable Social Security Regulations or case law, that the Administrative Law Judge improperly based his RFC findings [on] his own non-medical opinion, that he wrongly rejected opinions of treating physicians and a consultative psychologist regarding the claimant's residual functional capacity which established her to be incapable of substantial gainful employment and that on the basis of such multiple errors his decision and the final decision of the Commissioner may not be affirmed.

(Doc. No. 21 at 28.) More specifically, Claimant argues that the ALJ improperly rejected the results of the functional capacity evaluation performed on March 1, 2000, by Exercise Physiologist and Certified Athletic Trainer Maureen Miller, M.S., M.T.C.; the opinions of her treating physicians, Drs. Shishir Shah, M.D., Dr. Tiffany R. Thymius, D.O., and Dr. Miriam Rogin, M.D.; as well as the opinion of examining physician Dr. Amy L. Wirts, M.D., and accorded significant weight to the opinions of Dr. Marcel Lambrechts, M.D., a state agency physician. (<u>Id.</u> at 29-34.) Claimant asserts that the May 9, 2001, opinion of Dr. Lambrechts was made without the benefit of any physical examination note from a treating or examining source statement regarding Claimant's physical capacities and was made without consideration of Ms. Miller's functional capacity evaluation of March 1, 2000. (<u>Id.</u> at 29.) Claimant further alleges that the ALJ's analysis of her pain and credibility prior to her date last insured, combined with the ALJ's reliance on Dr. Lambrechts' opinion, does not support the ALJ's RFC assessment of light work. (<u>Id.</u> at 31-34.)

The Commissioner asserts that the ALJ properly rejected the opinions of Drs. Shah, Thymius, Rogin, and Wirts, as well as the opinion of Ms. Miller. (Doc. No. 26 at 16-17.) The Commissioner asserts that the ALJ also relied upon the opinion of Dr. Cooke, who reviewed the medical evidence of record. (<u>Id.</u> at 16.) The Commissioner does not address specifically the ALJ's pain and credibility assessment prior to Claimant's date last insured.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b)

and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If

such an impairment is established, then the intensity and persistence of the pain or symptoms and the

extent to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a

claimant proves the existence of a medical condition that could cause the alleged pain or symptoms,

"the claimant's  subjective complaints [of pain] must be considered by the Secretary, and these

complaints may not be rejected merely because the severity of pain cannot be proved by objective

medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence

of pain should be gathered and considered, but the absence of such evidence is not determinative.

Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are

considered to diminish her capacity to work to the extent that alleged functional limitations are

reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and

416.929(c)(4) (2006).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your
> prior work record, your statements about your symptoms, evidence submitted by your
> treating, examining, or consulting physician or psychologist, and observations by our
> employees and other persons. . . .  Factors relevant to your symptoms, such as pain,
> which we will consider include:
>
> (I) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other
> symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you
> take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief
> of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other

22

symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006). SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities.

23

20 C.F.R. §§ 404.1520(c) and 416.920(c).

As previously noted, the ALJ in the instant case thoroughly considered and summarized the medical evidence of record. (Tr. at 26-49.) After consideration of all the evidence, the ALJ determined that Claimant retained the RFC for light work that consisted of routine repetitive tasks. (Tr. at 25.) The ALJ determined that Claimant can occasionally climb, balance, stoop, kneel, crouch, or crawl, and cannot make more than frequent use of her upper extremities, with frequent being defined as up to two-thirds of the time. (Id.) He further determined that Claimant should avoid moderate exposure to vibration and any exposure to extreme cold or hazards. (Id.) Claimant argues that the ALJ's determination was not based upon the evidence, but Claimant fails to acknowledge that much of the evidence supports the ALJ's determination.

Regarding Claimant's application for DIB, prior to her date last insured, the ALJ noted that when she filed her application in March, 2000, she reported experiencing constant pain, which was aggravated by any activity. (Tr. at 34, 215.) Additionally, he noted her reports that she could sit for 15 to 20 minutes, stand for 10 to 15 minutes, lie down for one to two hours at a time, walk 20 yards, and lift a maximum of five pounds once or twice at a time. (Tr. at 34, 215.) The ALJ concluded however, that Claimant's reported activities of daily living were inconsistent with the severity of the limitations stated above. (Tr. at 34.) As discussed above, Claimant reported that she did light household chores, including cooking and laundry; drove a car several times a week to the store, post office, and to medical appointments; drove long trips to visit relatives if she had someone to accompany her; and did her own grocery shopping weekly and carried grocery bags weighing five to ten pounds each. (Tr. at 34.) The ALJ further noted Dr. Shah's notes that Claimant was able to do light housework and groom and dress herself. (Id.) However, Claimant reported that she needed help in dressing and bathing. (Id.)

24

The ALJ further noted that Claimant's pain was treated with a "conservative course of treatment, including medication, physical therapy, and injections, and [that] the treatment record shows that the claimant's symptoms did respond to treatment." (Tr. at 32-33.) The ALJ therefore, concluded that while Claimant's impairments could reasonably be expected to produce the pain and other symptoms alleged, the intensity and persistence of Claimant's pain was not as limiting as Claimant reported, and therefore, that Claimant was not entirely credible.

The ALJ further considered the opinions of Drs. Shah, Thymius, Rogin, Wirts, and Lambrechts, as well as the opinion of Ms. Miller, as discussed below. Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2004). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical

25

signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2004). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(i) and 416.927(f)(2)(i).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006). The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and  416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals

26

Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply

the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources

on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471,

34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the

adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical

source statement,' which is a 'statement about what you can still do despite your impairment(s)'

made by an individual's medical source and based on that source's own medical findings." Id. SSR

96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an

individual's medical source reflecting the source's opinion based on his or her own knowledge,

while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this

opinion and all the other evidence in the case record about what an individual can do despite his or

her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in

20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions."

Id. at 34474.

A. *Maureen Miller's Functional Capacity Evaluation*.

On October 29, 1999, nearly three months prior to Claimant's alleged onset date, Claimant

was examined by Christopher Kim, M.D., on referral from Claimant's then treating physician, Dr.

Long. (Tr. at 427.) At that time, Claimant complained of neck pain and bilateral shoulder and arm

pain secondary to low back pain with radiation to her bilateral hips and legs. (Id.) Claimant's physical

exam was essentially normal and Dr. Kim noted only some limited lumbar flexion. (Tr. at 428.)

Nevertheless, in an attempt to alleviate Claimant's complaints of pain, Dr. Kim began a series of

epidural steroid injections. (Tr. at 422, 425-26, 428.) Following the injections, on November 11 and

December 17, 1999, Claimant reported 75-85% relief in pain. (Tr. at 416, 425.) On February 3, 2000,

Claimant reported however, that she had excellent pain relief from the lumbar epidural steroid

injection, but that the pain had returned. (Tr. at 415.) She reported that due to the pain, she was not

able to work. (Id.) Dr. Kim therefore, recommended that Claimant undergo a functional capacity

evaluation to determine the degree of her disability, and advised that he had nothing further to offer

Claimant at that time. (Id.)

Pursuant to Dr. Kim's recommendation, Claimant underwent a functional capacity evaluation

on March 1, 2000, by Maureen Miller, MS, ATC, Exercise Physiologist and Certified Athletic

Trainer. (Tr. at 395-97, 643-45.) Ms. Miller classified Claimant as capable of performing sedentary

part-time work. (Tr. at 397, 645.) However, the report indicated that Claimant exhibited "symptom

magnification syndrome," as six criteria were rated high, and the report indicated that it was "invalid"

due to Claimant's very poor or submaximal effort. (Id.) Due to these internal indicators of invalidity

and symptom magnification, the ALJ rejected Ms. Miller's opinion that Claimant was limited to

sedentary part-time work. (Tr. at 33.) The undersigned agrees with the Commissioner and finds that

the ALJ properly rejected Ms. Miller's functional capacity evaluation performed on March 1, 2000,

due to internal indicators of invalidity and symptom magnification.

### B. *Dr. Shah's Opinions of September 27, 2001, and June 17, 2003.*

The medical evidence contains records regarding Claimant's treatment at The Know Pain

Clinic from March 26, 2001, through December 15, 2004. (Tr. at 532-36, 564-71, 572-79, 606-07,

673-746, 855-60, 954-75.) On initial evaluation on March 26, 2001, Claimant reported to Dr. Shah

that she suffered neck and low back pain with associated numbness, tingling, and weakness in her

arms bilaterally. (Tr. at 534, 579.) She further reported that her low back pain was paralumbar in

nature, greater on the right than left, and radiated to her right hip and down her mid-thigh and occasionally to her ankle. (Id.) Claimant reported however, that she was able to do light housework, groom and dress herself, and walk for exercise. (Tr. at 535, 578.) On examination, Claimant exhibited full range of motion in all her extremities and only a slightly limited lumbar range of motion. (Tr. at 535-36, 578-79.) Straight leg raising was negative, deep tendon reflexes were normal, muscle strength was almost normal at 4/5, and sensation was grossly intact, with the exception of decreased sensation of the L4-5 dermatomes on the left. (Tr. at 536, 577.) Dr. Shah diagnosed osteoporosis, degenerative joint disease of the spine, degenerative disc disease of the lumbar spine, and bulging disc of the cervical spine. (Id.) A new series of epidural injections were recommended to help with the neck pain and cervicogenic headaches, as well as prescription medications. (Id.)

Claimant returned to the Clinic on April 18, 2001, with continued complaints of neck, shoulder, arm, and mid-back pain with frequent muscle spasms. (Tr. at 576.) She described the pain as a constant, throbbing, ache with occasional sharp shooting qualities. (Id.) Claimant's exam and diagnoses were essentially the same, and Dr. Shah continued Claimant's medications. (Id.) On May 17, 2001, Claimant's pain continued, though Dr. Shah noted that she walked "regularly." (Tr. at 574.) A series of lumbar facet injections and an injection to the sacroiliac joint were begun on June 15, 2001. (Tr. at 572.) On July 18, 2001, Dr. Shah noted that Claimant had experienced cervicogenic headaches, which were believed to have stemmed from her neck and shoulder pain. (Tr. at 564.) Claimant reported that her low back pain was tolerable following the injection on June 15, and she rated the pain at a level four out of ten. (Id.)

On August 15, 2001, Claimant reported continued neck, arm, and shoulder pain, which she rated at a seven or eight out of ten at its worst, a five or six out of ten with medication, and at a six out of ten at the time of the examination. (Tr. at 606.) Dr. Shah noted some tenderness of the lumbar

29

spine and some crepitus of the cervical spine. (Tr. at 607.) Claimant did not want an injection on that date. (Id.) On September 27, 2001, Dr. Shah completed a Questionnaire submitted by Claimant's attorney on September 27, 2001, on which he opined that Claimant should avoid repetitive lifting and lifting in excess of ten pounds. (Tr. at 611-12.) Dr. Shah noted however, that "[t]his is our opinion. We do not do FCE on Disability Eval." (Tr. at 612.) The ALJ considered Dr. Shah's opinion and noted that he failed to indicate any additional comments in the space provided regarding Claimant's pain level or restrictions. (Tr. at 36.) The ALJ therefore, concluded that he could not give any significant weight to Dr. Shah's responses because "he responded to leading questions, and he did not express much confidence in his own answers. Also, 'repetitive' was not precisely defined, and it does not correlate with any terms for the frequency of postural activity used in the Dictionary of Occupational Titles." (Id.) The ALJ therefore, did not give "any significant weight" to Dr. Shah's responses. (Id.)

The Commissioner, citing Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004), and Mason v. Shalala, 994 F.2d 1058, 1065 (3rd ir. 1993), seems to assert that without more, the ALJ is not required to give significant weight to mere checkmark or fill-in-the-blank opinions. (Doc. No. 26 at 17.) In this particular instance, the undersigned agrees with the Commissioner. Dr. Shah merely stated that Claimant should avoid repetitive lifting and lifting in excess of ten pounds. As the ALJ noted, Dr. Shah did not reference Claimant's pain level or limitations, and the evidence from The Know Pain Clinic through September 27, 2001, does not indicate that Claimant was limited in lifting or presented with significant decreased ranges of motion, despite complaints of arm, shoulder, neck, and back pain. It appeared that Claimant had responded to treatment, and even requested that she not receive an injection in August, 2001. Furthermore, Dr. Shah indicated that he and his associates did not complete functional capacity evaluations. Therefore, he may not have been familiar with the

30

standards and definitions as applied in social security cases. Accordingly, the undersigned finds that the ALJ's decision not to give any significant weight to Dr. Shah's September 27, 2001, opinion is supported by substantial evidence of record.

Subsequent to Dr. Shah's opinion, and regarding Claimant's application for SSI, Claimant continued to return to the Clinic through December 15, 2004. From October 3, 2002, through December 15, 2004, Claimant's diagnoses included myofascial pain syndrome with associated degenerative disc disease of the cervical spine, mild fibromyalgia, suprascapular neuritis, sacroilitis, degenerative disc disease of the lumbosacral spine, facet arthropathy and left SI dysfunction, a bulging disc at L5-S1 with anteriolisthesis of the cervical region, glenohumeral joint arthropathy. (Tr. at 686, 688, 692, 701, 704, 706, 855-60, 954-75.) On December 23, 2002, Dr. Shah requested an MRI of Claimant's cervical and lumbar spine which revealed a normal thoracic spine, and multiple levels of disc desiccation in the lumbar spine, as well as a non-compressive disc bulge at L5-S1. (Tr. at 809.) On January 4, 2002, Dr. Shah wrote a letter in response to Claimant's attorney's request indicating that Claimant complained of neck and low back pain with associated radicular symptoms of tingling and weakness in her upper extremities and into her hips and mid-thighs from the lumbosacral spine. (Tr. at 647.) Dr. Shah reported that Claimant's complaints were consistent with his findings and were validated by the physical findings of spasms and trigger points, and that her body mechanics were not exaggerated. (Id.) During periods of increased activity, Dr. Shah noted that Claimant's complaints of pain were consistent with exacerbation related to associated muscle groups (i.e., spasms in her arms and shoulders, as well as increased swelling in her hips and SI joints). (Id.) He reported her diagnoses as degenerative disc disease of the cervical spine with right-sided suprascapular neuritis and cervicogenic neuralgia, multiple paracervical trigger points, and degenerative disc disease and osteoporosis of the lumbar spine. (Id.) Based on the above information,

31

Dr. Shah opined that Claimant "should avoid lifting more than ten (10) pounds. Patient can perform activities as her body can tolerate. We do not do functional capacity or disability evaluations." (Id.) As discussed above however, Dr. Shah did not address the frequency of Claimant's lifting limitation.

        *C.  <u>Dr. Thymius' Opinion of October 2, 2001</u>.*

The record further contains records from Claimant's treatment with Dr. Tiffany R. Thymius, D.O., at New River Health Associates, from August 6, 2001, through March 4, 2003. (Tr. at 580-82, 583-84, 811-829.) On August 6, 2001, Dr. Thymius noted the diagnoses of degenerative joint disease, osteoporosis, chronic pain syndrome, and depression. (Tr. at 582.) She opined that Claimant was "unable to sit or stand for long periods of time. Also unable to lift anything [greater than ten pounds]." (<u>Id.</u>) In a form General Physical (Adult) completed for the West Virginia Division of Health and Human Services, on August 9, 2001, Dr. Thymius opined that Claimant was unable to work full time at her customary occupation. (Tr. at 580.) She noted that Claimant frequently falls with increased motion and activity and that she should therefore, avoid prolonged standing and sitting, as well as lifting in excess of ten pounds. (<u>Id.</u>) In assessing the duration of Claimant's inability to work full time, Dr. Thymius stated that Claimant "is new to me it is unknown what her full potential could be." (<u>Id.</u>)

On August 9, 2001, Dr. Thymius noted that Claimant was doing fairly well with her medication regimen and that her pain was under good control, if they could continue to limit her activity. (Tr. at 584.) On exam, Dr. Thymius noted increased cervical lordosis with increased paraspinal muscle tightness on both sides of Claimant's neck and limited neck range of motion with side bending and rotation. (<u>Id.</u>) Regarding Claimant's back, Dr. Thymius noted increased thoracic kyphosis with increased paraspinal tightness bilaterally and slightly increased lumbar lordosis with moderate increase in paraspinal musculature. (<u>Id.</u>)

32

Dr. Thymius opined on October 2, 2001, that Claimant was "unable to do any kind of work that required her to have repetitive lifting or repetitive motion. These type of actions are very likely to aggravate her underlying medical condition and can cause her extreme pain, and possibly detriment." (Tr. at 608.) She noted that Claimant's conditions were chronic and progressive, and the she did not expect her conditions to resolve in the near future. (Id.)

On July 25, 2002, Dr. Thymius completed a form General Physical (Adult) for the West Virginia Department of Health and Human Services. (Tr. at 789-90.) Dr. Thymius noted that Claimant's major diagnosis was degenerative joint disease and that her minor diagnoses were depression, fibromyalgia, and diabetes mellitus. (Tr. at 790.) She noted that Claimant "falls frequently [with] increased motion and activity.", and opined that she could perform sedentary work with a maximum lifting requirement of ten pounds or less, and with very frequent breaks. (Id.) She further opined that Claimant should avoid prolonged sitting and standing. (Id.)

The ALJ summarized Dr. Thymius' opinion but gave no weight to the opinion because it was not well supported by medical evidence or rationale. (Tr. at 45.) In rejecting Dr. Thymius' opinion, the ALJ stated:

> Dr. Thymius identified degenerative joint disease and depression as the claimant's major impairments. The limitations that Dr. Thymius assessed - that is, no prolonged sitting, prolonged standing, or lifting more than 10 pounds - would not result in disability in a younger person such as the claimant. Although Dr. Thymius reported that the claimant had chronic pain due to degenerative joint disease and osteoporosis, the reason that the doctor gave for the claimant not being able to work full-time was frequent falls with increased activity. Dr. Thymius did not follow the claimant for her musculoskeletal complaints, and the treatment record does not cite any reports of falls. Except for one visit when the claimant was emotionally upset, the claimant never presented in any acute distress. As of the date of the DHHR report, the claimant's depression appeared to be responding to hormone therapy. The treatment note of July 25, 2002, states that the claimant "has been feeling generally well and has no complaints.

33

(Tr. at 45.) The undersigned finds that the ALJ's decision not to accord significant weight to Dr. Thymius' opinion is supported by substantial evidence. The record indicates that Claimant generally responded to treatment and does not indicate any limitations as severe as those stated by Dr. Thymius. Accordingly, for the reasons stated by the ALJ, the undersigned finds that the ALJ's decision is supported by substantial evidence.

      D. *Assessment of Dr. Miriam Rogin*.

      The medical evidence further indicates that Claimant treated with Dr. Miriam E. Rogin, M.D., on December 7 and 28, 2004. (Tr. at 978-81.) On December 7, 2004, Claimant reported that she recently lost her medical cared because she was afraid to live alone in her trailer and stays with her boyfriend a few houses away. (Tr. at 980.) On exam, Dr. Rogin noted that Claimant appeared well and was moving normally. (Id.) Examination of Claimant's extremities was negative. (Id.) Regarding her mental status, Dr. Rogin noted that she was tearful, that she was reluctant to accept suggestions, and that she had hoped to obtain Oxycontin, which she no longer could afford from the Know Pain Clinic. (Id.) Dr. Rogin noted the following diagnoses: degenerative disc disease, with previous x-rays showing multiple levels of disc desiccation in the lumbar/sacral spine; disc bulging at C5-6 and C6-7; diabetes mellitus; and gastroesophageal reflux disease. (Id.) Dr. Rogin referred her to Mental Health and suggested that she live in her own residence so that she could obtain medical benefits. (Id.) However, Claimant did not want to do this. (Id.) Dr. Rogin advised Claimant to return in six weeks, as she did not want to prescribe Oxycontin at that time.

      Claimant was examined by Dr. Rogin again on December 10, 2004. (Tr. at 981.) She requested that Dr. Rogin send the West Virginia Division of Health and Human Resources a letter advising that she was unable to live alone. (Id.) Claimant reported that she was unable to dress herself due to arm pain or clean her house due to fatigue, and that when she falls, she is unable to get up by

herself. (Id.) Dr. Rogin opined that while Claimant had physical problems, "some of her problems are somatization and that she would benefit from ongoing counseling." (Id.)

On December 28, 2004, Claimant reported that due to her right arm and neck pain, she could not use computers or hold a phone for more than short periods of time. (Tr. at 979.) Dr. Rogin that an MRI of Claimant's right shoulder on December 24, 2004, revealed peritendinitis and tendonopathy, and an MRI on the same date of her cervical spine revealed spondylotic protrusion at C5-6 and end plate hypertrophy at C6-7. (Id.) On examination, Dr. Rogin noted that Claimant's gait was abnormal in that she did not move her right arm as she walked. (Id.) Claimant presented with very limited right shoulder motion, and was barely able to abduct her right arm or do internal or external rotation. (Id.) Dr. Rogin diagnosed degenerative disc disease of the cervical spine and peritendinitis of the right shoulder with tendonopathy. (Id.) Dr. Rogin scheduled a bone density test and an EMG study of Claimant's neck and shoulder. (Tr. at 978.)

Also on December 28, 2004, Dr. Rogin completed a form General Physical (Adults) for the West Virginia Department of Health and Human Services. (Tr. at 1003-04.) Though the form is difficult to read, it indicates that Claimant was referred to Dr. Rogin on December 13, 2004, for a physical exam. (Tr. at 1003.) On exam, Dr. Rogin noted that Claimant presented with very limited range of right shoulder motion and that she was unable to rotate internally more than fifteen degrees. (Id.) Dr. Rogin's diagnoses are indecipherable but she opined that Claimant was unable to work due to right arm and shoulder pain, which makes it impossible for her to lift. (Tr. at 1004.) The pound limitation is difficult to read. (Id.) On January 18, 2005, Dr. Rogin completed a form Questionnaire at the request of Claimant's attorney. (Tr. at 1008-09.) The form indicates that Claimant treated with Dr. Rogin on December 7 and 28, 2004, and that prior thereto, Claimant was examined by other associates at New River Health Associates. (Tr. at 1008.) On the form, Dr. Rogin indicated that

35

Claimant has the following problems: broad-based and spondylotic protrusion at C5-6, mild end plate hypertrophy at C6-7, central spinal canal narrowing, tendonopathy of the right shoulder, peritendinitis of the rotator cuff, acromioclavicular joint arthropathy of the right shoulder, degenerative impingement into C4-5 and C5-6 neural foraminal bilaterally, degenerative disc disease of the lumbar spine, and disc bulging at C4-5. (<u>Id.</u>) Dr. Rogin opined that Claimant's impingement into the C4-5 and C5-6 neural foraminal bilaterally and other findings in the cervical spine supported Claimant's complaints of severe neck pain, and that MRI findings regarding Claimant's cervical spine supported her complaints of numbness, tingling, and weakness in her arms bilaterally. (Tr. at 1008-09.) She further opined that Claimant should avoid repetitive lifting, use of her upper extremities, and lifting in excess of ten to fifteen pounds. (Tr. at 1009.) Finally, Dr. Rogin opined that postural movements would exacerbate Claimant's neck and beck pain, and that the combined effect of all Claimant's problems were disabling. (<u>Id.</u>)

The ALJ summarized Claimant's treatment with Dr. Rogin and the opinions of Dr. Rogin, and determined that her opinions were not entitled to much weight. (Tr. at 47.) At the time of Dr. Rogin's examinations of Claimant and the assessments, Claimant was without pain medication, and was seeking Oxycontin from Dr. Rogin. (<u>Id.</u>) Therefore, Dr. Rogin's assessment on December 28, 2004, was not "representative of the claimant's functioning throughout the relevant time period or predictive of her ongoing functioning, given prescribed treatment for her right shoulder." (<u>Id.</u>) The ALJ noted that the medical evidence does not indicate what treatment Claimant received in the interim or her response to treatment. (<u>Id.</u>) Nevertheless, the ALJ concluded that the record does not support Dr. Rogin's specific limitations regarding Claimant's avoidance of repetitive lifting or repetitive use of her upper extremity and lifting more than ten to fifteen pounds. (<u>Id.</u>) As stated above, the medical evidence does not support such strict limitations, and therefore, the undersigned finds that

36

the ALJ's decision not to accord significant weight to Dr. Rogin's opinions is supported by substantial evidence.

E. *Physical Capacities Evaluation of Dr. Amy L. Wirts.*

On April 4, 2002, Claimant was examined by Dr. Amy L. Wirts, at the request of Claimant's attorney. (Tr. at 660-63, 664-66.) Dr. Wirts noted Claimant's complaints of chronic debilitating neck, back, and left knee pain since 1998 due to osteoporosis and severe degenerative joint disease. (Tr. at 660.) On physical exam, Claimant presented with mild crepitus of her right knee and was wearing an air cast on her left lower extremity. (Tr. at 662.) She had mild tenderness in the thoracic, lumbar, and cervical regions with diffuse trapezius muscle soreness. (Id.) Claimant was not able to walk on her toes or heels due to left knee pain. (Id.) Dr. Wirts noted that Claimant's deep tendon reflexes were 1+ bilaterally and that she had bilateral up going toes on both feet. (Id.) She diagnosed chronic neck, back, and left knee pain secondary to osteoporosis and degenerative joint disease since 1998; osteoporosis; bilateral carpal tunnel syndrome status post surgery on her left hand in 1994; type II diabetes mellitus; fibromyalgia; bronchial asthma; early cataracts; early glaucoma; chronic dysthmic disorder; generalized anxiety disorder; somatization disorder; a history of alcohol dependence in remission for an extensive period of time; and personality disorder, not otherwise specified and hypochondriacal characteristics." (Id.) Based on the foregoing, Dr. Wirts opined that "based on [Claimant's] limited education, and skills, and her chronic neck, back, and left knee pain, this individual can not perform beyond very limited amounts of time of sedentary work." (Id.)

Dr. Wirts also completed a physical capacities evaluation in which she opined that Claimant was capable of sitting one hour out of an eight-hour workday and was capable of standing for four hours. (Tr. at 664.) She further opined that Claimant could lift or carry a maximum of five pounds on an occasional basis, could simple grasp bilaterally, could not push or pull arm controls or perform

37

fine manipulation activities, bilaterally. (Tr. at 665.) However, she could use her feet for repetitive movements, but not in the left leg. (<u>Id.</u>) Dr. Wirts opined that Claimant could occasionally bend, climb, and reach, but could never squat or crawl. (<u>Id.</u>) Finally, she opined that Claimant was fully restricted from unprotected heights; driving automotive equipment; and exposure to dust, fumes, and gases; and was moderately restricted from exposure to marked changes in temperature and humidity; and being around moving machinery. (Tr. at 666.)

> In according no significant weight to Dr. Wirts' opinion, the ALJ stated:

> Since there is no evidence of compression fractures, the doctor's opinion rests on a "modest" degree of degenerative joint disease, which would not appear to be disabling to a younger person. Dr. Wirts concluded that "based on her limited education and skills, and her chronic neck, back and left knee pain, this individual (the claimant) cannot perform beyond very limited amounts of time of sedentary work." Dr. Wirts's opinion cannot be given significant weight because the doctor considered vocational factors, which are not within her professional expertise. Dr. Wirts did not identify specific physically based limitations that restrict the claimant in performing work activities.

(Tr. at 45.) The undersigned finds that the ALJ's assessment of Dr. Wirts' opinion is supported by substantial evidence of record. Though the ALJ indicates that Dr. Wirts assessed degenerative joint disease was modest and generally not disabling to a younger person, the evidence of record does not support Dr. Wirts' strict limitations, especially regarding the use of her hands and arms and in sitting. The undersigned has already determined that a similar restriction in lifting was not supported by the record, and for the same reasons, concludes so here.

### F. *Dr. Lambrechts' RFC Assessment.*

On May 9, 2001, Dr. Lambrechts, a non-examining, state agency physician, opined that Claimant was capable of performing light work with occasional postural limitations. (Tr. at 542-49.) Dr. Lambrechts noted that Claimant suffered from carpal tunnel syndrome in 1999, but noted that she reported no recent complaints. (Tr. at 543.) He noted that Claimant received several facet point

38

injections for relief of pain and that her diabetes and hiatal hernia were well-controlled. (Tr. at 547.) He therefore, opined that "I don't find any good reasons for claimant to be fully disabled. In my opinion, she can still perform light work activity." (Id.) In reaching this conclusion, Dr. Lambrechts specifically considered Claimant's injections to her lumbar and cervical spine on October 29 and November 11, 1999; her complaints of neck, back, and hip pain on February 28, 2000; her complaints of neck and back pain on January 25, 2000, and the evidence of a positive straight leg raising bilaterally, but no focal neurological deficit or edema; the diagnostic evidence of a small hiatal hernia on February 1, 2000; and her complaints of neck pain, headache, and hip pain, together with a diagnosis of neck strain on February 22, 2001. (Tr. at 549.)

The ALJ adopted Dr. Lambrechts' opinion of May 9, 2001, and the opinion of the state agency medical consultant, Dr. Charles L. Cooke, M.D., who likewise opined that Claimant was capable of performing light exertional work, and could frequently balance, kneel, crouch, crawl, and stoop. (Tr. at 620.) Dr. Cooke further opined that Claimant could frequently perform fingering activities. (Id.) He noted that while an EMG study supported moderately severe right carpal tunnel syndrome, a neurological examination on March 26, 1998, was essentially normal, with the exception of slightly decreased sensation. (Tr. at 652.) Regarding Dr. Lambrechts, the ALJ noted that his evaluation was completed a little more than one month after her date last insured, and therefore, did not allow for evidence of her cervical radiculopathy. (Tr. at 34.) The ALJ therefore, adopted Dr. Lambrecht's assessment with a somewhat more limited use of her upper extremities than he originally thought, but not to the degree Claimant alleged. (Id.) Though Dr. Lambrechts did not consider the opinions of Dr. Shah and Ms. Miller, the undersigned has already determined that Ms. Miller's opinion was invalid and that Dr. Shah's was not supported entirely by the record. Accordingly, any error resulting therefrom is harmless, and the undersigned finds the ALJ's adopting

39

the opinions of Drs. Lambrechts and Cooke is supported by substantial evidence.

Dr. Lambrechts completed a further physical RFC assessment on April 10, 2003, in which he again opined that Claimant was capable of performing light exertional work with occasional postural limitations. (Tr. at 846-54.) He additionally opined that Claimant should avoid concentrated exposure to extreme cold and hazards, and should avoid even moderate exposure to vibration. (Tr. at 850.) Dr. Lambrechts noted Claimant's history of carpal tunnel syndrome but noted that it was not mentioned in the reports of the past two years. (Tr. at 849-50.) Though he indicates that he did not consider any treating or examining source statement, Dr. Lambrechts notes that some of Claimant's symptoms are not supported by her treating physicians' reports. (Tr. at 851.) Nevertheless, he acknowledges that the evidence demonstrates neck and back pain, supported by an MRI. (Id.) He further noted that she suffered from osteoporosis, which was being treated with medication; type 2 diabetes, which was being treated by Glucophage; and heart palpitations. (Id.) In reaching his decision, Dr. Lambrechts considered several medical notes of record, including those by his treating physicians Dr. Shah and Dr. Thymius. (Tr. at 853.)

Though Dr. Lambrechts did not establish specific limitations regarding Claimant's right shoulder impairment, as Claimant notes, the ALJ adopted his assessment with the inclusion of a limitation on Claimant's "use of her upper extremities due to cervical radiculopathy." (Tr. at 48.) Accordingly, based on the foregoing, Dr. Lambrechts' assessment is consistent with Claimant's reported activities and reflects her response to treatment throughout the years. Though Claimant takes issue with the ALJ finding that her reported activities of daily living are menial and are not intended to support sustained work activities, the undersigned disagrees. Claimant testified that she was able to care for herself with some minor exceptions, maintain her house, do laundry, prepare simple meals, drive to various locations, watch television, and visit her mother and daughter. These activities,

combined with the objective evidence of record support the ALJ's finding that she is capable of performing light work.

### 4. Past Relevant Work.

Finally, Claimant alleges that the ALJ erred at step four of the sequential analysis when he failed to perform a function by function analysis of Claimant's past relevant work as required by SSR 96-8p. (Doc. No. 21 at 34-37.) Specifically, Claimant asserts that the ALJ's decision regarding her past relevant work as a telemarketer is not supported by substantial evidence because he did not perform a function by function analysis, and because Ms. Miller opined that Claimant was precluded from performing her work as a telemarketer. (Id. at 35.) Regarding her past relevant work as a cashier, Claimant asserts that the ALJ did not state specifically what the physical demand was for the job and instead relied on the VE's testimony that light exertion would not prevent her from performing her past work. (Id.) Claimant further alleges that the ALJ did not accommodate Claimant's mental impairments with regard to her ability to perform her past relevant work. (Id. at 35-36.) Finally, Claimant asserts that the VE testified that Claimant would not be able to perform her past relevant work with the limitations established in the opinions of Drs. Thymius, Rogin, Wirts, and Shah. (Id. at 36.) The Commissioner asserts that the ALJ clearly indicated the functions of Claimant's past relevant work as a telemarketer and as a cashier, and therefore, performed a function by function analysis and correctly determined that she could return to her past relevant work. (Doc. No. 26 at 18.)

SSR 96-8p defines the RFC assessment as a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." After assessing Claimant's RFC, the ALJ proceeded to consider whether Claimant was capable of performing her past relevant work as a telemarketer and cashier. (Tr. at 50-52.) In his decision, the ALJ stated that the job of telemarketer, as generally performed in the national economy is a semi-skilled, sedentary

41

occupation. (Tr. at 50.) The job of telemarketer, as actually performed by Claimant however, was an unskilled, sedentary occupation. (Id.) The VE testified at the hearing that Claimant was not required to have, and did not have, an insurance license, and therefore, the telemarketer job as performed by her, was considered unskilled. (Tr. at 109-10.) The ALJ noted that Claimant indicated that she occasionally lifted twenty pounds, with the exception of one report in which she indicated that she occasionally lifted up to fifty pounds. (Tr. at 50.) The ALJ discounted this report because Claimant offered no explanation for the significant difference in weight when she was lifting the same objects. (Id.) The ALJ further noted pursuant to Claimant's reports, the telemarketer job, as she performed it, did not require climbing, balancing, stooping, crouching, kneeling, crawling, or making more than occasional or minimal use of her upper extremities to reach or handle. (Id.) Claimant performed the job indoors away from machinery that would cause vibration or pose a hazard. (Id.) Therefore, the ALJ determined that his assessed RFC was consistent with Claimant's past relevant work as a telemarketer, as she actually performed it. (Id.)

Regarding Claimant's past relevant work as a cashier, the ALJ noted that because Claimant performed the job with other work activities, such as a deli cook, the physical demands associated with it, as she performed it, are not clear. (Tr. at 50.) Nevertheless, based on the VE's testimony, the ALJ determined that the cashier job, as performed in the national economy, was a light level, skilled occupation. (Id.) The ALJ further noted that according to the Dictionary of Occupational Titles ("DOT"), the cashier job does not require more than frequent reaching or handling; does not expose the worker to extreme cold, hazards, or vibration; and does not require balancing, climbing, stooping, kneeling, crouching, or crawling. (Id.)

Based on the foregoing, it is clear that the ALJ performed a function by function analysis of Claimant's past relevant work as a telemarketer and cashier. The ALJ properly relied on the VE's

description of the jobs as performed in the national economy, as the VE testified that such descriptions were consistent with the <u>DOT</u>. Accordingly, the undersigned finds Claimant's allegation on this issue to be without merit.

Regarding Claimant's contention that Claimant's past relevant work is inconsistent with the opinions as to Claimant's limitations as assessed by Ms. Miller and Drs. Shah, Thymius, Rogin, and Wirts, the undersigned finds that Claimant's argument is without merit. The undersigned has determined above that the ALJ's rejection of these opinions was supported by substantial evidence, and therefore, the ALJ was not required to adopt the limitations therein in determining whether Claimant could return to her past relevant work.

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities -- presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51; <u>see also</u> <u>English v. Shalala</u>, 10 F.3d 1080, 1085 (4th Cir. 1993) (stating that "in questioning a vocational expert in a social security disability hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the Claimant's impairments.").

A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence. <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987); <u>see also</u> <u>Pickney v. Chater</u>, 96 F.3d 294, 296-7 (8th Cir. 1996) (holding that "a hypothetical question posed to a vocational expert must capture the concrete consequences of claimant's deficiencies"); <u>Osenbrock</u>

v. Apfel, 240 F.3d 1157, 1163-64 (9th Cir. 2001) (stating that "An ALJ must propose a hypothetical to a vocational expert that is based on medical assumptions supported by substantial evidence in the record that reflects each of the Claimant's limitations."). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. Benenate v. Schweiker, 719 F.2d 291, 292 (8th Cir. 1983). If a Claimant's complaints are not credible, the hypothetical question posed to the vocational expert should contain no reference to them. See Jones v. Bowen, 841 F.2d 849, 851 (4th Cir. 1988.)

At the administrative hearing, the ALJ inquired of the Vocational Expert whether an individual with Claimant's age, education, work experience and the RFC for light work with the ability to perform routine repetitive tasks, with occasional postural limitations, and limitations to extreme cold, vibration, hazards, and more than frequent use of the upper extremities, was capable of performing Claimant's past relevant work. (Tr. at 110.) The VE responded that such person could perform Claimant's past relevant work as a telemarketer and cashier. (Id.) The VE further responded that with the same limitations contained in the first hypothetical, with the exception of sedentary work, such person could perform Claimant's past relevant work as a telemarketer and cashier. (Tr. at 110-11.) Accordingly, the undersigned finds that the ALJ posed a hypothetical question to the VE which contained the limitations assessed by Dr. Lambrechts, which were adopted by the ALJ, and that his reliance on the VE's response was proper. The ALJ's decision therefore, is supported by substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Doc. No. 21.), **GRANT** the Defendant's Motion

for Judgment on the Pleadings (Doc. No. 26.), **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: February 29, 2008.

R. Clarke VanDervort
United States Magistrate Judge

45